PIT RIVER TRIBE; Native Coalition for Medicine Lake Highlands; and Mount Shasta Bioregional Ecology Center, Plaintiffs,

v.

BUREAU OF LAND MANAGEMENT; United States Department of the Interior; U.S. Forest Service; Advisory Council on Historic Preservation; and Calpine Corporation, Defendants.

No. CIV–S–02–1314 DFL/JFM.

United States District Court,
E.D. California.

Feb. 13, 2004.

---

Deborah Ann Sivas, Esq., Earthjustice Legal Defense Fund, Owen House, Stanford, CA, for Plaintiffs.

Edmund F. Brennan, Assistant U.S. Attorney, Sacramento, CA, for Defendant U.S. Forest Service and Bureau of Land Management.

Jeffery Donald Harris, Esq., Ellison, Schneider and Harris, Esq., Sacramento, CA, Richard Oehler, Esq., Perkins Coie, LLP, Seattle, WA, Robert A. Maynard, Esq., Perkins Coie, LLP, Boise, ID, for Defendant Advisory Council on Historic Preservation and Calpine Corp.

### MEMORANDUM OF OPINION AND ORDER

LEVI, Chief Judge.

The Pit River Tribe, joined by two other groups, challenges the decision-making process followed by the Bureau of Land Management ("BLM") and the United States Forest Service in connection with a geothermal lease to Calpine Corporation on BLM lands near Medicine Lake, California. Calpine proposes to build a geothermal power plant on the lease lands, at a location known as Fourmile Hill. Plaintiffs ask the court to set aside the leases, thereby putting a stop to the proposed power plant. They bring suit under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Geothermal Steam Act, the National Forest Management Act ("NFMA"), and the Administrative Procedure Act ("APA"). Additionally, the Tribe alleges violations of the federal government's trust obligations. The parties have filed cross-motions for summary judgment.

### I. Facts and Procedural History

#### A. The Medicine Lake Highlands and the Pit River Tribe

The lead plaintiff is the Pit River Tribe ("Tribe"), a federally registered Indian tribe. The Tribe has lived in Northern California and Southern Oregon for thousands of years. (Pls.' Mot. for PSJ at 3.) The Medicine Lake Highlands ("Highlands") is an area located in Klamath, Modoc, and Shasta–Trinity National Forests, though its borders are not clearly defined. (FEIS Fig. S–1.) The area is within the Tribe's ancestral homeland; however, the Highlands are not tribal land, and the Tribe exercises no external sovereignty over the area. (Compl.Ex. A.) The Highlands are considered sacred by the Tribe and contain a number of important spiritual and cultural sites that are still used by members of the Tribe. (FEIS at 3–64.)

#### B. Geothermal Leases and the Fourmile Hill Project

The federal government has designated the general area of the Highlands as the Glass Mountain Known Geothermal Resource Area ("KGRA"). The Glass Mountain KGRA may be capable of producing up to 500 megawatts of electricity. (Calpine's Reply at 20–22.) Under authority of the Geothermal Steam Act, 30 U.S.C. § 1001 et seq., the BLM leased the two

parcels at issue in the Glass Mountain KGRA to the predecessor in interest of Calpine in 1988 for an initial term of 10 years. (FEIS at 1–12; AR 21274.) Calpine was assigned the leases in 1996, although it had obtained operating rights in 1994. (FEIS at 1–12.) The BLM extended the leases for terms of five years in 1998. (AR 21274.)

In 1994, Calpine drilled a temperature core hole well at the location of the proposed power plant, now in dispute, known as the Fourmile Hill Development Project ("Fourmile Hill"). (FEIS at 1–12.) The power plant would be built approximately three miles northwest of Medicine Lake in the Klamath National Forest, well within the area traditionally described as the Medicine Lake Highlands. (FEIS at 1–1.) In 1995, Calpine proposed a plan of operations that included drilling another exploration well at Fourmile Hill. (FEIS at 1–14.) In 1996, Calpine submitted a full development proposal for Fourmile Hill including a 50–megawatt power plant with power transmission lines from the plant to a main line 24 miles away. (FEIS at S–21, 22.) The clearance necessary for the power lines would disturb significantly more land (335 acres) than that needed for the plant itself (about 50 acres). (FEIS at 2–12.) The BLM considered several different routes for the power transmission lines, settling on the one that it determined would have the least adverse impact on the area.

In 2000, Calpine acquired CalEnergy, the other major geothermal lessee in the Glass Mountain KGRA. (Calpine's Answer ¶ 100.) CalEnergy was the owner and operator of a lease within the Glass Mountain KGRA that contains a well capable of producing geothermal steam in commercial quantities, known as a paying well. (Calpine's SUF ¶ 24.) Under the BLM's Geothermal Steam Act regulations, a paying well on one lease entitles that lessee to 40–year extensions on its other leases. Because Calpine acquired a paying well, the BLM granted a 40–year extension to Calpine for its other leases in the Glass Mountain KGRA on May 2, 2002. (*Id.* ¶ 25.)

C. *Various NEPA Compliance Documents*

The leasing and development process has led to the creation of a number of NEPA documents. To begin with, in 1973, the Department of the Interior prepared a programmatic Environmental Impact Statement ("EIS") for nationwide implementation of the Geothermal Steam Act. (AR 17071–19558.) In 1981, when the initial decision was made to issue leases in the Glass Mountain KGRA, the BLM completed an environmental assessment ("EA"), which addressed primarily the impacts of casual use exploration, including geologic mapping, soil sampling, and aerial surveys. (AR 19626, 19637.) A supplemental EA ("SEA") was completed in September 1984. The SEA addressed the exploration, development, and production phases. (*Id.*) Based on the SEA, the BLM made a Finding of No Significant Impact ("FONSI"), such that an EIS was deemed unnecessary before the initial letting of geothermal leases at the Glass Mountain KGRA. (AR 19621.) When Calpine submitted its exploration plan in 1995, the BLM completed an EA and issued a FONSI before approving the exploration plan. (FEIS at 1–14, 16.) No EA or EIS was completed when the leases were extended for five-year terms in 1998 or for 40–year terms in 2002. After Calpine submitted its Fourmile Hill project proposal in 1996, the federal defendants began work on an EIS. The agencies completed the Fourmile Hill final EIS ("FEIS") in September 1998.

The FEIS is organized into three main sections. The first describes the alternatives, including the proposed action. (FEIS at 2–1 to 2–80.) This section dis-

cusses the nature of the Fourmile Hill project, including all the various components of the power plant. It also lays out the proposed alternative routes for the power lines carrying electricity from the plant to the central transmission lines. The second significant section of the FEIS describes the environment affected by the project. (*Id.* at 3–1 to 3–216.) It discusses the natural environment, for example, vegetation and wildlife, as well as the human environment, for example, recreation and transportation. This section includes a discussion of "traditional cultural values." (*Id.* at 3–64 to 3–77.) Finally, the FEIS has a section devoted to the environmental consequences of the project and the mitigation measures adopted. (*Id.* at 4–1 to 4–340.) This section analyzes the impacts on all the various aspects of the natural and human environment discussed in the previous section. This section includes the FEIS' discussion of the unavoidable significant effects of the project, including those to traditional cultural values. (*Id.* at 4–335.)

### D. Tribal Consultations

The record is silent as to when consultation with the Pit River Tribe or any other tribe began. The Tribe received a copy of the 1995 EA concerning Calpine's proposed exploration plan. (Fed. Defs.' Opp'n at 14.) The Tribe did not appeal the BLM's FONSI. (*Id.*) The BLM and Forest Service consulted the Pit River and Klamath Tribes on a number of occasions during the preparation of the Fourmile Hill EIS. Between October 1995 and April 1998, the Forest Service and the BLM had six meetings with the Pit River Tribe and eight meetings with the Klamath Tribes. (FEIS at 3–66.) In addition, Calpine hired an ethnographic consultant to study the

area's importance to local Indians. The consultant interviewed 31 local residents, mostly from the Pit River Tribe, and also made several site visits. (*Id.* at 3–66 to 3–68.) This study was incorporated into the FEIS.

### E. Agency Actions: the Record of Decision, the Moratorium, and the Forest Plan Amendment

After completion of the FEIS, the BLM and Forest Service issued a joint project Record of Decision ("ROD") approving the Fourmile Hill project on May 31, 2000.[1] (AR 19982–20008.) However, the ROD contained a five-year moratorium on further development in the Glass Mountain KGRA, pending analysis of the actual impacts of the development of the Fourmile Hill project. (AR 19983.) On June 15, 2001, the BLM decided to lift the moratorium, citing: (a) the serious national energy shortage, (b) a new executive order directing agencies to expedite projects that increase energy production, and (c) the recommendations of the President's National Energy Policy Development Group for more geothermal power and for the streamlining of the geothermal leasing process. (AR 15471–15472.) By lifting the moratorium, the agency allowed potential further geothermal development on additional leases within the Glass Mountain KGRA, whether by Calpine or another lessee.

The ROD also announced a change in the Klamath Forest Plan Standard 24–25. (AR 19984.) The old Standard provided: "Protect traditional Native American rights and practices (Public Law (PL) 95–341) to insure the integrity of the site and to assure that the use will continue to occur and will not be impaired." (FEIS at

---

1. Shortly before the ROD was issued, the BLM, Forest Service, State Historic Preservation Officer, and Advisory Council on Historic Preservation completed a Memorandum of Agreement regarding the project under the National Historic Preservation Act. (AR 20051–20071.)

4–77.) The new Standard states: "Protect traditional American Indian cultural and religious uses and practices consistent with Public Law 95–341 (American Indian Religious Freedom Act of 1978)." (AR 19984.)

F. *Procedural History*

The Tribe filed an administrative appeal of the ROD with the Forest Service and BLM. (AR 19559, 20086.) Both appeals were denied, and this action followed. (*Id.*) The plaintiffs advance ten claims: (1) the Fourmile Hill FEIS is inadequate under NEPA; (2) the project approval violates the National Historic Preservation Act; (3) the 1998 lease extension violates the Geothermal Steam Act; (4) the 1998 lease extension violates NEPA; (5) the 1998 lease extension violates NHPA; (6) lifting the five-year moratorium violates the Administrative Procedure Act; (7) the Klamath Forest Plan amendment violates the National Forest Management Act; (8) the failure to comply with forest plan standards violates the NFMA; (9) the development of the Highlands without adequate consultation with the tribes violates the federal government's trust obligation to American Indians; and (10) the failure to timely implement all conditions in the Record of Decision is willful agency inaction in violation of the APA.

The parties have filed cross-motions for summary judgment on all claims.

## II. *Sufficiency of the Fourmile Hill Environmental Impact Statement*

The plaintiffs argue that the Fourmile Hill FEIS is deficient in its scope and depth of analysis and thus violates NEPA. At first blush this would seem rather unlikely. The FEIS is approximately 700 pages long. NEPA's implementing regulations state that an EIS of "unusual scope or complexity shall normally be less than 300 pages," and a single 50–megawatt power plant is not of "unusual scope or

complexity." 40 C.F.R. § 1502.7. An entire ethnographic study was made of the area's importance to local American Indians and is incorporated into the FEIS. Nevertheless, plaintiffs argue that the FEIS is insufficient.

The central thrust of plaintiffs' argument is that the FEIS does not explicitly compare the significant adverse impacts that any geothermal development in the Medicine Lake Highlands will have on Indian spiritual life to the relatively small amount of electricity that can be produced there. Moreover, plaintiffs contend that this comparison should have been made in light of other methods for producing an equivalent amount of electricity in other locations.

Plaintiffs misconstrue the requirements of NEPA. NEPA does not require an FEIS directed to a particular project to discuss, much less to set, national energy priorities. Rather, NEPA requires full disclosure of the adverse environmental impacts of the proposed development, as compared with alternative ways of accomplishing the same thing at the same site. Here, the various agencies did not need to consider the virtually unlimited number of methods and locations for generating 50 megawatts of electricity, like windmills near Yreka, a coal-fired plant outside of Redding, or a new hydro-electric project on some western river. Congress has already made it national policy to pursue geothermal power generation, in the limited number of locations where it is feasible, through the Geothermal Steam Act. The 1973 programmatic EIS that accompanied the Geothermal Steam Act considered alternative sources of power; thereafter it was unnecessary for every geothermal project to reinvent the wheel. All of the alternative sources of electrical power that plaintiffs might suggest fail to accomplish the central purpose of the Fourmile Hill

project—the development of a geothermal power plant to exploit the clean, renewable energy source that lies beneath the mountains of the Medicine Lake Highlands. Moreover, as further discussed below, the FEIS fully identifies the costs and benefits of the Fourmile Hill project. It does not conceal the possible damage to tribal spiritual values and observance, nor does it exaggerate the potential power generation at the site. NEPA requires no more.

■■■ The court's decision to uphold the Fourmile Hill FEIS also reflects the deferential standard of review under the Administrative Procedure Act, which governs the review of agency decisions within the NEPA framework. *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 953 (9th Cir.2003). Under the APA, an agency decision may be overturned only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Ninth Circuit applies the "rule of reason" when reviewing the adequacy of an EIS. *Selkirk Conservation Alliance,* 336 F.3d at 958. The EIS must contain a "reasonably thorough" discussion of the relevant issues. *Id.* However, the reviewing court must not "fly speck" the document. *See Churchill County v. Norton,* 276 F.3d 1060, 1071 (9th Cir.2001); *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 496 (9th Cir.1987). The role of the court is to ensure that the agency took a "hard look" at the environmental consequences of the proposed action. *Churchill County,* 276 F.3d at 1072. It is not the role of the court to decide whether the agency made the correct choice among the various possible options.

Plaintiffs argue that the FEIS is insufficient because: (1) it does not adequately discuss the impact of geothermal development on Indian spiritual life; (2) it contains an overly narrow statement of purpose and an overly vague statement of need; (3) it fails to consider appropriate alternatives; (4) it has an insufficient cumulative impacts analysis; (5) there are various technical deficiencies or omissions; and (6) a supplemental EIS is necessary to address several issues. The court now turns to these specific attacks on the FEIS.

*A. Discussion of the Impact on Indian Spiritual Life*

The plaintiffs' central complaint about the FEIS is that it fails to address head-on "the wisdom of this stark tradeoff—that is, sacrifice of the Highlands' environmental integrity, Pit River Tribe cultural life, and ten thousand years of spiritual practice in return for a minuscule amount of electricity." (Pls.' Opp'n at 2.) They argue that there should have been an explicit balancing of the harm to the spiritual significance of the Highlands from the cumulative impacts of development against the benefits of the geothermal power, as compared to alternative ways to produce the same amount of power. (Pls.' Opp'n at 10.) However, the plaintiffs recognize that the FEIS acknowledges that the project "will have significant unavoidable adverse impacts on traditional Native American cultural uses and religious practices," and includes an in-depth study of the cultural and spiritual significance of the Medicine Lake Highlands. (Pls.' Opp'n at 4.)

■■ Plaintiffs' complaint is either with the style and format of the FEIS or with the defendants' ultimate decision to permit the geothermal project despite its adverse effects. The FEIS does disclose the very impacts the plaintiffs want discussed. For example, the FEIS states that "elements of the project would be visible and audible at sites in the Medicine Lake Highlands," which may lead local Indians "to not use sites in the project region." (FEIS at 4–78.) The FEIS also clearly discloses the energy capacity of the Fourmile Hill pro-

ject. (FEIS at S–1.) The "stark tradeoff" the plaintiffs complain of is not highlighted because the FEIS undertakes to discuss all impacts of the project: to wildlife, air quality, recreation, and others. However, as long as the impacts are fully discussed, as they are here, the FEIS cannot be legally deficient for not emphasizing particular effects and then performing a separate cost-benefit analysis effect by effect. The EIS must ensure that the reader will "understand the very serious arguments advanced by the plaintiff if he carefully reviews the entire environmental impact statement." *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir.2000). The Fourmile Hill FEIS adequately discloses the negative effect of development on Indian spirituality in return for 50 megawatts of electrical power generation. In plaintiffs' view, this trade-off cannot justify the decision to approve the project. But that is not a procedural deficiency under the APA and NEPA; rather, it is a disagreement on policy outside the scope of appropriate judicial review.

### B. Overly Narrow Statement of Purpose and Overly Vague Statement of Need

The FEIS states that the project's purpose is "to develop the geothermal resource on Calpine's Federal Geothermal Leases" and further states that the need was previously demonstrated by a number of federal energy laws, including the Geothermal Steam Act. The FEIS also emphasizes the need for alternative energy sources. (FEIS at 1–3.) The plaintiffs argue that the purpose is stated too narrowly and specifically, while the need is stated too vaguely.[2] According to the plaintiffs, the purpose should have been phrased narrowly but generically—to produce approximately 50 megawatts of electricity. Plaintiffs argue that by narrowly defining the purpose as development of geothermal resources on Calpine leases, the agencies "have essentially preordained the outcome of the evaluation" because no other alternative would satisfy that purpose. (Pls.' Opp'n at 9–13.)

The "purpose and need" section of an EIS is important because it defines the scope of the alternatives analysis. *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir.1998). Thus, when the purpose and need are stated narrowly, few alternatives need be discussed because few alternatives will achieve the same specific purpose and meet the same need. The rule of reason applies to this section of the EIS, such that the statement of purpose cannot be unreasonably narrow. *Id.* at 1067. The Ninth Circuit has not held an EIS deficient because of an improper statement of purpose or need and has approved a number of site-specific, narrow statements. *See id.* (purpose was to "meet market demand for timber in Southeast Alaska"); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1155–57 (9th Cir.1997) (purpose was to achieve a particular flow of traffic on a stretch of highway). For example, in *City of Angoon v. Hodel,* 803 F.2d 1016, 1021 (9th Cir.1986), the Ninth Circuit reversed the district court and found that the EIS' stated purpose of providing a "safe, effective means of transfer-

---

2. Plaintiffs criticize the statement of need in the FEIS as overly vague. The FEIS relies upon other statutes and directives, such as the Geothermal Steam Act, which suggest a policy in favor of geothermal power development. Plaintiffs argue that none of the documents cited expresses any need for development in the Glass Mountain KGRA specifically. But plaintiffs never suggest a more appropriate formulation of the statement of need. According to the plaintiffs, a proposed power development must do more than just identify a purported need for energy. (Pls.' Opp'n at 13.) The formulation in the FEIS is more specific than this by citing a need for geothermal development specifically.

ring timber" from a particular tract of land to market was not improperly narrow and rejected the contention that the purpose should have been stated more broadly as "commercial timber harvesting." *Id.* at 1021. The court held that a site-specific proposal need not have a "broad social interest" purpose and need. *Id.*

■ The stated purpose and need in the Fourmile Hill FEIS is appropriate for a site-specific EIS. It is not unreasonable for the FEIS to focus narrowly on this particular project and to state its purpose in terms of the geothermal leases held by Calpine. Earlier NEPA documents have considered the broader actions. The programmatic EIS considered whether any geothermal development was advisable. The 1984 SEA considered whether to begin geothermal leasing at the Glass Mountain KGRA. In light of these two more general documents, it is entirely appropriate for the Fourmile Hill FEIS to state its purpose narrowly.

## C. Consideration of Appropriate Alternatives

■ The alternatives analysis is the "heart" of the EIS. 40 C.F.R. § 1502.14; *Friends of Southeast's Future*, 153 F.3d at 1065. The range of alternatives is dictated by "the stated goal of a project." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812 (9th Cir.1999). As with the rest of the EIS, the "rule of reason" applies to the agencies' choice of alternatives. *City of Angoon*, 803 F.2d at 1020. Plaintiffs argue that the FEIS fails to consider enough appropriate alternatives. (Pls.' Opp'n at 13–16.) The FEIS considers a no-action alternative and six alternatives that differ only in the placement of the project's power lines. The plaintiffs argue that the FEIS is inadequate because it fails to consider other energy technology like solar energy or "amending the Klamath and Modoc Forest Plans to protect the area from development." (Pls.' Opp'n at 15.)

■ The alternatives considered in the Fourmile FEIS are narrow. However, they are tailored to the statement of purpose and need, and "it makes no sense to consider the alternative ways by which another thing might be achieved." *Friends of Southeast's Future*, 153 F.3d at 1067. This is especially true when the sorts of alternatives suggested by plaintiffs, other sources of power and complete protection of the site, are the functional equivalent of the no-action alternative. The sorts of alternatives suggested by the plaintiffs are more appropriate to earlier NEPA documents, and, indeed, the programmatic EIS for the Geothermal Steam Act did consider alternative sources of electricity including coal, oil, natural gas, nuclear, hydroelectric, and solar. (AR 17430–17581.) The discussion of these alternatives is thorough, if not exhaustive, stretching some 150 densely worded pages. The different alternative sources of energy are discussed in turn, each with its own advantages and disadvantages, merits and demerits. The discussion includes not just the direct environmental impacts of power generation, but also the impacts of extraction and transportation of the fuel where that is relevant, such as for coal, oil, and nuclear power. In light of this extensive discussion of alternatives, the BLM decided to issue regulations to put the Geothermal Steam Act into effect. Thus, as a result of earlier environmental analyses, the BLM already had settled on developing geothermal power, where possible, despite the various other ways that the nation can meet its electricity needs. The only task for the FEIS is to identify the effects of developing geothermal power at the Fourmile Hill site.

At a more specific level, plaintiffs downplay the importance of the FEIS' consider-

ation of several alternative routes for the electrical transmission lines leading from the plant. These transmission lines would have to travel the 24 miles from the plant to the main Bonneville Power Authority transmission line. Construction of the power plant itself would disturb only 50 acres of wilderness, but constructing the transmission lines would require disturbing over six times that amount—335 acres. (FEIS at 2–12.) The FEIS considers six different routes for the transmission lines, a serious exploration of the different alternatives. (FEIS at 2–60.)

Additionally, the Ninth Circuit has held that the plaintiff bears the burden of coming forward with a "specific, detailed counterproposal" and must do so as early as possible in the NEPA process. *Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 576 (9th Cir.1998). The plaintiffs have failed to offer any alternative proposals other than vague references to alternative power sources and the no-action alternative restated differently. The FEIS adequately discusses the alternatives that are appropriate in light of the project's purpose and need.

### D. Cumulative Effects Analysis

An EIS must analyze the cumulative impacts from reasonably foreseeable future actions. 40 C.F.R. § 1508.7. Plaintiffs contend that the Fourmile Hill FEIS fails to adequately analyze the cumulative effects of future geothermal projects in the Glass Mountain KGRA because it considers only one other proposed geothermal project, a proposed power plant known as Telephone Flat. They argue that there is a likelihood of continued geothermal development in the area, leading to additional plants beyond the proposed Fourmile Hill and Telephone Flat plants.[3] (Pls.' Opp'n at 17.)

■ The BLM concluded that the impacts from further geothermal development beyond the two proposed projects were too speculative to be considered in the FEIS. The BLM found that additional development in the Glass Mountain KGRA would "depend on the success of the currently proposed projects and the market for power." (FEIS at 4–333.) In other words, the economic feasibility of geothermal power generation is currently unknown, and Fourmile Hill and Telephone Flat are test cases. If they are unsuccessful, then the BLM concluded that there would be no more geothermal development in the area. (*Id.*) Even if these projects prove successful, there is no way for the BLM to know precisely where additional commercially viable geothermal resources could be found because the necessary exploration has not yet occurred.

Given these uncertainties, the BLM concluded that it is "too speculative to attempt to estimate the expected environmental effects of future geothermal development projects." (*Id.*) The Telephone Plant proposal is the only project that the record suggests is being actively considered by the BLM or by any of the geothermal lessees. The plaintiffs cite a number of pieces of evidence which indicate that the

---

3. The plaintiffs' only specific objection to the inadequate cumulative impacts analysis, however, is that the "vast landscape-level impacts from such build-out [ten or more power plants] would be devastating to the Tribes' spiritual interests in and cultural uses of Medicine Lake and the surrounding Highlands." (Pls.' Opp'n at 19.) But the FEIS' discussion of cumulative impacts indicates that the activities considered would "result in cumulatively significant visual impacts" and "in cumulatively significant impacts on traditional cultural uses." (FEIS at 4–317, 321.) These impacts are not quantifiable. Therefore, even had other future projects been factored in, the conclusion would have been the same—that the development would "result in cumulatively significant impacts" on traditional cultural uses and the natural visual aesthetic.

parties are contemplating the possibility of future development. (Pls.' Mot. at 17–18.) But none of that evidence indicates that there are any projects beyond the talking stage or that further development would be commercially or practically viable. Because of all of the obstacles to future development, and the general uncertainty surrounding it, the BLM's determination that Telephone Flat is the only reasonably foreseeable future development is reasonable.

E. *Various Alleged Technical Deficiencies and Omissions*

■ Plaintiffs advance a number of objections to the FEIS that can be grouped under this heading. The objections all amount to impermissible fly-specking of a complex, lengthy FEIS. *See Friends of Southeast's Future,* 153 F.3d at 1063 (holding that court must not "fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies") (internal quotation omitted).

1. *Socioeconomic Impacts on Native Americans*

The plaintiffs argue that "[t]he continuing erosion of Native peoples' spiritual connection to the land—and the loss of traditional religious sites for spiritual renewal—may well increase or exacerbate social ills, such as substance abuse [and] mental illness." (Pls.' Opp'n at 20.) The only support offered for this assertion is a declaration by a member of the Tribe. (Preston Decl. ¶¶ 7–8.) He offers no expert qualifications for his opinion, nor does he cite any statistical study of Indian substance abuse or mental illness that finds a reliable causal connection to the loss of traditional religious sites. The FEIS discusses at length the impact of the project on the Tribe's cultural and spiritual use of the land. (FEIS at 4–59 to 4–81.) It recognizes that the project would "disproportionately affect the local American Indi-

ans because it could affect tribal use and spiritual values." (FEIS at 4–296.) The FEIS' rather comprehensive discussion of the impacts on local Indians is adequate.

2. *Nitrogen Emissions*

■ Plaintiffs argue that the FEIS is based on flawed estimates of nitrogen oxide emissions. Plaintiffs' argument reveals interagency disagreement between the Siskiyou County Air Pollution Control District, the California Air Resources Board, and the EPA. (Pls.' Opp'n at 22–24.) However, NEPA does not require a court "to resolve disagreements among various scientists." *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1359 (9th Cir.1994). "An agency must have discretion to rely on the reasonable opinions of its own qualified experts even if ... a court might find contrary views more persuasive." *Id.* (omission in original) (quoting *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The FEIS apparently relies on the data and opinion of the Siskiyou County Air Pollution Control District. Where there are divergent views among various experts, as here, the BLM is entitled to rely on the analysis and conclusions of a local agency with expertise and experience in the field like the Siskiyou County Air Pollution Control District.

3. *Hydrogen Sulfide Emissions*

The plaintiffs also argue that the FEIS' discussion of hydrogen sulfide emissions is inadequate. (Pls.' Opp'n at 24–25.) There were differing expert estimates of hydrogen sulfide emissions from a completed power plant at Fourmile Hill: one at about 7 tons per year during operation, one at roughly 18 tons per year. (FEIS at 4–230; AR 15391) This is a serious difference. But even the plaintiffs attribute this to "a lack of information about the chemical properties of the geothermal resource."

(Pls.' Opp'n at 25.) The FEIS is based on the expectation that concentrations of hydrogen sulfide will be low. (FEIS at 4–324.) In addition, many mitigation measures are required, and the emission is governed by the Clean Air Act. The FEIS contains substantial discussions of hydrogen sulfide emissions. The FEIS' reliance on expert predictions and mitigation by technological controls is not unreasonable.

### 4. Water Quality Analysis

Plaintiffs' argument that the FEIS' water quality analysis is flawed comes down to two statements in the FEIS that plaintiffs find contradictory. Plaintiffs point to one statement asserting that the geothermal reservoir is replenished from deep sources and to another asserting that recharge occurs from surface waters.[4] (Pls.' Opp'n at 26.) The document as a whole seems to be based on the assumption that there is an impenetrable layer between the surface/shallow ground water and the deeper geothermal reservoir. (See FEIS at 3–42 to 3–50.) The plaintiffs identify one sentence in a 700–page document that could possibly be interpreted as suggesting that "some" of the lost geothermal fluids "may" be replaced from groundwater sources. (FEIS at 4–44.) No reliance appears to be placed on this tentative statement. This is fly-specking; the FEIS' discussion of water quality and hydrology is not unreasonable.

### F. Failure to Prepare a Supplemental EIS

Plaintiffs argue that a number of flaws were found in the FEIS and that the corrections were not circulated to the public. (Pls.' Opp'n at 28–33.) They also argue that an SEIS should have been prepared to incorporate these corrections. The corrections relate to National Register eligibility, noise and visual impacts, and seismic activity.

■ An agency must supplement an EIS when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). In these circumstances, an agency cannot "rest on the original document" but must continue to take a "hard look at the environmental effects of its action." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir.2000). None of the three items cited by the plaintiffs is significant enough to require an SEIS. In 1999, after the FEIS was completed, the Medicine Lake Highlands were determined to be eligible for listing on the National Register of Historic Places. However, the FEIS discusses at length the cultural and archeological resources in the area; eligibility of the area for listing on the National Register does not change these underlying facts. (FEIS at 3–52 to 3–63.) Moreover, that the agencies and Calpine conducted supplemental noise and visual impact studies after the Register eligibility was announced shows that they continued to take a hard look at the environmental consequences. It would be perverse to create a disincentive to further analysis.

■ The finding of one additional fault-line and a potential increase in the likelihood of seismic activity also does not warrant a supplemental EIS. The FEIS

---

**4.** The FEIS states that "[i]t is possible that some natural recharge to the geothermal reservoir occurs via the caldera ring fractures system." (FEIS at 4–44.) This seems to indicate recharge from shallow groundwater or surface water. Earlier in the document, the FEIS states that "[s]hallow groundwater within the caldera is probably separated from the shallow groundwater outside the caldera by shallow impermeability within the ring fracture system .... The geothermal system may be recharged from deep groundwater." (FEIS at 3–50.)

discusses the risks of seismic activity and states that there is a risk of damage to wells and pumps and damage to the transmission lines. The FEIS concludes that the risks are low because the historic seismic activity in the area has been low. (FEIS at 4–8.) The discovery of an additional fault-line does not alter these risks—none of which are very threatening—so significantly as to warrant an SEIS. The agencies' decision not to prepare an SEIS will be overturned only if arbitrary and capricious. *Envtl. Coalition of Ojai v. Brown,* 72 F.3d 1411, 1418 (9th Cir.1995). None of the facts cited by the plaintiffs show the agencies' decision to be arbitrary and capricious.[5]

## G. Conclusion

■■■■■ An EIS need only be sufficient to foster "both informed decision making and informed public participation." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,* 126 F.3d 1158, 1183 (9th Cir.1997) (internal quotations omitted). The 700–page Fourmile Hill FEIS comprehensively discusses all of the impacts from the project, including a significant discussion of its impact on the local Indians. None of the omissions or deficiencies raised by the plaintiffs is unreasonable. NEPA requires only informed agency decision making, not any particular outcome. The role of the reviewing court is not to insure that the agency made the best decision possible, or even a reasonable one, but simply that the environmental impact statement prepared by the agency contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Churchill County,* 276 F.3d at 1071. The Fourmile Hill FEIS includes a more than reasonably

thorough discussion of the probable environmental consequences of the proposed development at Fourmile Hill.

## III. National Historic Preservation Act Challenge to the Project Approval

■■■■■ Plaintiffs contend that the federal agencies violated the National Historic Preservation Act by not properly identifying historic properties on the Fourmile Hill site. The National Historic Preservation Act requires the agency to take the following actions prior to a federal undertaking: "make a reasonable and good faith effort to identify historic properties; determine whether identified properties are eligible for listing on the National Register . . .; assess the effects of the undertaking on any eligible properties found; determine whether the effect will be adverse; and avoid or mitigate any adverse effects." *Muckleshoot Indian Tribe,* 177 F.3d at 805 (citations omitted). There are few cases that analyze NHPA's requirements. The leading case analyzing the good faith identification requirement is *Pueblo of Sandia v. United States,* 50 F.3d 856, 859–63 (10th Cir.1995). In *Sandia,* the Forest Service's only effort to identify important cultural properties was a request for information from the tribes. *Id.* The court held that this was not reasonable nor in good faith. *Id.* In *Muckleshoot Indian Tribe,* the Ninth Circuit relied on *Sandia* to find that actions by the Forest Service satisfied the statute. 177 F.3d at 806–07. The Forest Service's actions in *Muckleshoot Indian Tribe* did not include interviews and field surveys, and thus were less extensive than those at Fourmile Hill. *Id.* The efforts at Fourmile Hill went well beyond those in

---

5. The plaintiffs also separately argue that the FEIS is deficient because the seismic data were not circulated for public comment and review. They cite no cases for this proposition. If the data do not necessitate an SEIS, then they cannot invalidate the FEIS. To hold otherwise would be inconsistent with the regulations and cases that govern when an SEIS is necessary.

*Sandia* and *Muckleshoot* and were not unreasonable or in bad faith.[6]

Plaintiffs specifically argue that the agencies' decision not to attempt to identify the cultural resources along every alternative power line route was unreasonable.[7] However, a BLM regulation provides that "[w]here the alternatives under consideration consist of corridors or large land areas, ... the agency official may use a phased process to conduct identification and evaluation efforts." 36 C.F.R. § 800.4(b)(2). This regulation allows postponing the process of identifying sites until the agency chooses between the alternatives. *Id.* "The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement." *Id.* There is a memorandum of agreement on Fourmile Hill, signed by the BLM, the Forest Service, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation,[8] which provides for additional studies on "places subject to the direct and indirect effects by the proposed Project transmission line." (AR 20056.) In the circumstances here, the defendants have met their identification and evaluation obligations under NHPA and its implementing regulations.

### IV. Challenges to the 1998 Lease Extension

#### A. The NEPA and NHPA Claims

■ When the leases were extended for five years in 1998, the BLM conducted no NEPA review. Neither an EA nor an EIS was completed. The plaintiffs argue that the lease extensions therefore violated NEPA. (Pls.' Mot. at 22.) Plaintiffs also argue that the defendants' failure to prepare any report on the 1998 lease extension violated NHPA. (*Id.* at 26.) However, the completion of the Fourmile Hill FEIS moots both of these claims.[9]

■ NEPA and NHPA are procedural statutes. *Apache Survival Coalition v. United States*, 21 F.3d 895, 906 (9th Cir. 1994). The relief available is also only procedural. A plaintiff's effort to compel agency compliance with the statutory procedures is mooted when the agency later completes those very same procedures because that is the only relief plaintiff to which is entitled. Thus, the completion of

---

6. The plaintiffs challenge the agencies' NHPA compliance under the APA. The highly deferential standard of review under the APA applies here as it does elsewhere. *See San Carlos Apache Tribe v. United States*, 272 F.Supp.2d 860, 886 n. 16 (D.Ariz.2003). Plaintiffs make a separate argument that the defendants failed to coordinate their NHPA and NEPA analyses. The regulations do suggest coordination of NHPA review with review under other statutes, including NEPA. 36 C.F.R. § 800.3(b) ("should coordinate"). This is an agency directive intended to benefit the agency by preventing duplication of effort, so that the agency can use "information developed for other reviews" to satisfy NHPA. *Id.* Plaintiffs cite no authority for the proposition that agency review under NEPA and NHPA must be coordinated or that the analysis must somehow reflect this coordination.

7. NHPA regulations only require "a reasonable and good faith effort to carry out appropriate identification efforts." 36 C.F.R. § 800.4(b)(1).

8. The Pit River Tribe, and other tribes, were invited to sign the MOA but apparently declined.

9. Calpine also asserts a laches defense to these claims. "[L]aches must be invoked only sparingly in environmental cases." *Portland Audubon Soc'y .v. Lujan*, 884 F.2d 1233, 1241 (9th Cir.1989). The plaintiffs only learned of the lease extensions through a Freedom of Information Act request in 1999. Since then, they have written letters to the EPA and Forest Service and made comments during the EIS processes for both Fourmile Hill and Telephone Flat. (Pls.' Reply in Support of PSJ at 26–27.) A finding of laches is inappropriate in these circumstances.

an EIS moots a claim that NEPA was violated when an agency failed to prepare an EA or EIS. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1163 (9th Cir.1999); *City of Newport Beach v. Civil Aeronautics Bd.*, 665 F.2d 1280, 1284 (D.C.Cir.1981) (filing of an EIS recommending agency action rendered claim moot); *Blue Ocean Pres. Soc'y v. Watkins*, 767 F.Supp. 1518, 1523 (D.Haw. 1991) ("[A] suit to compel an EIS is rendered moot when the EIS is completed and filed."). Plaintiffs contend that the lease extensions gave Calpine the right to develop geothermal plants on the leases and, thus, a full EIS considering the impacts of development should have been completed. (Pls.' Mot. at 23–25.) Even assuming that the plaintiffs' contention is correct, their challenge to the 1998 lease extension under those statutes is nevertheless moot because the completion of the FEIS satisfies NEPA, and the completion of the FEIS and the Memorandum of Agreement satisfies NHPA.[10]

### B. The Geothermal Steam Act Claim

Under the Geothermal Steam Act regulations applicable when the BLM extended Calpine's leases, a geothermal lessee must include a report with its extension request showing bona fide efforts to develop the geothermal resource through: (1) exploration, (2) permit applications (including environmental studies and other preliminary work), and (3) marketing or sales activities. These three activities are analyzed in

light of current economic factors. 43 C.F.R. § 3203.1–4(c)(1)(i)–(iv) (1997). Plaintiffs complain that the BLM violated the Geothermal Steam Act when it extended the leases in 1998. They argue that there is nothing in the record to demonstrate the bona fide efforts necessary for the lease extension, such that the BLM's 1998 decision was arbitrary and capricious. (Pls.' Mot. at 29–30.)

 In requesting an extension on the Fourmile Hill leases, Calpine submitted a brief statement of its activities. These activities included preparation of an EA supporting Fourmile Hill exploration, sinking the Fourmile Hill test well, and preliminary work on the Fourmile Hill development, mostly associated with the preparation of an EIS. (AR 21282.) Calpine's expenses for these activities totaled $2.5 million. (*Id.*) The statute and regulations provide explicitly that bona fide effort is judged against the backdrop of the current market for geothermal resources. 30 U.S.C. § 1005(h); 43 C.F.R. § 3203.1–4(c)(iv). Calpine took serious steps toward development at Fourmile Hill; the drilling of the test well alone cost nearly a half-million dollars. (AR 21282.) The BLM's determination that these activities were bona fide efforts was not arbitrary and capricious.

### V. Lifting the Five–Year Moratorium

 Plaintiffs argue that the BLM's lifting of the five-year moratorium on fur-

---

**10.** Even were the court to reach the merits, the plaintiffs' claims would fail. Agency actions that do not change the environmental status quo are not subject to NEPA. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir.1995). Where the action "will result in one injury" that is simply extended in time, for example, "continued degradation of the wetlands from grazing," the environmental status quo is unchanged. *Nat'l Wildlife Fed'n*, 45 F.3d at 1344. In this case, the lease extension did not change the environmental status

quo because the extensions gave the lessees no additional environment-disturbing rights. Therefore, the BLM's extension of the leases was exempt from NEPA. The extensions were similarly exempt from NHPA. "Because of the operational similarity between the two statutes, courts generally treat 'major federal actions' under the NEPA as closely analogous to 'federal undertakings' under the NHPA." *Sac and Fox Nation of Mo. v. Norton*, 240 F.3d 1250, 1263 (10th Cir.2001).

ther development in the Highlands violated the Administrative Procedure Act. (Pls.' Opp'n at 50–51.) Plaintiffs do not specifically identify what procedures the APA requires that were not followed in this case. The BLM rescinded the moratorium in an agency decision. (AR 15471–72.) It based the decision on the new, serious energy shortage, a new executive order directing agencies to expedite projects that increase energy production, and the recommendations of the President's National Energy Policy Development Group for more geothermal power and the streamlining of the geothermal leasing process. (*Id.*) There is a rational connection between the energy shortage and administrative policies favoring geothermal power and the lifting of the development moratorium. This is all that is required under the "arbitrary and capricious" standard of review under the APA. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001) ("To determine whether an agency violated the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts found and the choice made."). The BLM's decision to lift the development moratorium because of the nation's energy shortage was not arbitrary and capricious.

## VI. National Forest Management Act Claims

### A. The Klamath Forest Plan Amendment

Plaintiffs argue that the amendment of the Klamath Forest Plan Standard 24–25 violated the National Forest Management Act. The Plan amendment was announced in the 2000 ROD and is governed by the

NFMA regulations in effect in 1999.[11] The applicable regulation states that "the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan." 36 C.F.R. § 219.10(f) (1999). If the amendment is significant, then the same procedures should be followed as for development and approval of the plan itself. *Id.*

Plaintiffs contend that the amendment to Plan Standard 24–25 is significant. The old Standard provided: "Protect traditional Native American rights and practices (Public Law (PL) 95–341) to insure the integrity of the site and to assure that the use will continue to occur and will not be impaired." (FEIS at 4–77.) The new Standard states: "Protect traditional American Indian cultural and religious uses and practices consistent with Public Law 95–341 (American Indian Religious Freedom Act of 1978)." (AR 19984.) Plaintiffs argue that the new Standard significantly reduces the protection afforded to traditional Indian land uses. Defendants, on the other hand, argue that this was primarily a stylistic change.

There is a fair amount of regulatory guidance as to what is "significant," but none of it actually defines the term. The Forest Service Handbook gives a non-exclusive list of factors to be used to determine significance, which includes timing, location and size of the affected area, relationship to the long-term goals of the Plan, and application to future actions. Forest Service Handbook § 1909.12.5.32(3). The Forest Service Manual lists four categories of actions that are not significant amendments. Forest Service Manual § 1922.51. But these categories reuse the word "sig-

---

11. The current regulations require only that any amendment be based on the identification and consideration of the relevant issues, applicable information, and an analysis of the proposed amendment's effects. 36 C.F.R. § 219.8. The previous distinction between significant and non-significant amendments no longer exists, and it appears that even significant plan amendments no longer need to go through any particular procedure.

nificant", or a synonym, in the definitions, making these regulations tautological and therefore unhelpful.[12]

■ Whatever the meaning of the term "significant," the Forest Service's determination that a plan amendment is not significant is reviewed under the deferential arbitrary and capricious standard. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir.2002). Applying this standard, every published opinion reviewing the Forest Service's determination that a plan amendment is not significant has upheld that determination. *See id.* at 900 (holding that amendment of Forest Plan to allow a higher road density in a particular area was not significant); *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1034–35 (10th Cir.2002) (holding that amendment of Forest Plan to allow construction of a building too tall under the old standard was not significant); *Wyo. Sawmills, Inc. v. U.S. Forest Serv.*, 179 F.Supp.2d 1279, 1300–04 (D.Wyo.2001) (holding that amendment of Forest Plan that was more protective of traditional Indian use of land, at the possible expense of logging interests, was not significant).

■ Here, the Forest Service's determination that the amendment of Standard 24–25 is not a significant change to the Forest Plan is not arbitrary and capricious. The old and the new Standards have similar language, and both reference the American Indian Religious Freedom Act. Even assuming that the old Standard was enforceable and more protective of traditional Indian use of the land, a debatable point, the change is not obviously significant.[13] The amendment must be viewed against the Plan's "multiple-use goals and objectives." Insuring continued traditional uses of the land is but one goal of many in the Plan, including wildlife conservation, recreation, and logging. *See Native Ecosystems Council*, 304 F.3d at 900 (holding that a Forest Plan amendment was not significant because it did "not alter multiple-use goals or objectives for long-term land and resource management"). Under the regulations, the Forest Supervisor must determine whether the amendment is a significant amendment of the Plan, not just a significant amendment of any one of the Plan's provisions. Given that the new Standard continues to protect traditional Indian land uses, and that all of the myriad other land use "goals and objectives" remain unchanged, the Forest

---

12. For example, the Forest Service Manual lists four categories of actions that do not significantly affect the environment. The first three are: (1) "Actions that do not *significantly alter* the multiple-use goals and objectives ...;" (2) "Adjustments of management area boundaries when the adjustments do not cause *significant changes* in the multiple-use goals and objectives ...;" (3) *"Minor changes* in standards and guidelines." Forest Service Manual § 1922.51 (emphasis added).

13. The plaintiffs argue that the amendment is significant because the Fourmile Hill project was inconsistent with the old Standard and so could not have occurred without the amendment. (Pls.' Opp'n at 44.) There is language in the FEIS that indicates that the Forest Service believed that there was a "potential

inconsistency" between the new Standard and the language, though not "the intent," of the old Standard. (FEIS at 4–78.) This potential inconsistency arose from the Forest Service's interpretation of the phrase "assure that the use will continue to occur and will not be impaired" to mean that the Forest Service must insure that the Indian community will continue the religious use of an area. (*Id.*) The Forest Service's opinion was that this was an unenforceable policy because the agency could not require American Indians to continue to use an area in any particular way. The old Standard, interpreted in this fashion, would be unenforceable. The Plan amendment was intended to correct this supposed problem while maintaining a level of protection consistent with the American Indian Religious Freedom Act.

Service's determination that the amendment is not significant is not arbitrary and capricious.

## B. Project Approval

Plaintiffs allege that approval of the Fourmile Hill project violated the NFMA because the project is inconsistent with the Klamath and Modoc Forest Plans.[14] (Compl.¶ 124.) The plaintiffs argue that Fourmile Hill is inconsistent with the Modoc Plan Standard 2–5, which provides that the Plan will "[p]rotect access and use of sites and locations important to traditional Native American religious and cultural practices consistent with" the American Indian Religious Freedom Act ("AIRFA"). (Pls.' Opp'n Ex. G.)

Whether the Fourmile Hill project is consistent with Modoc Forest Plan Standard 2–5 depends on what that Standard means. Unfortunately, the Standard is ambiguous. It states that access and use will be protected consistent with AIRFA, so that AIRFA determines the scope of the Plan's protections. AIRFA states that "it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ..., including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites." 42 U.S.C. § 1996. None of the statutory language is directed to other land uses that may de-tract from religious observance while not preventing access to sites or preventing worship. Moreover, the general language about a "policy" of the United States has led courts to hold that AIRFA "requires federal agencies to consider, but not necessarily defer to, Indian religious values. It does not prohibit agencies from adopting all land uses that conflict with traditional Indian religious beliefs." *Wilson v. Block*, 708 F.2d 735, 747 (D.C.Cir.1983). The Ninth Circuit has held that AIRFA "does no more than direct federal officials to familiarize themselves with Native American religious values." *Standing Deer v. Carlson*, 831 F.2d 1525, 1530 (9th Cir. 1987).

■ The Forest Service's determination that the Fourmile Hill project is consistent with the Forest Plan provision cannot be deemed arbitrary and capricious. The Forest Service had before it a thorough evaluation of the tribes' spiritual interest in the Highlands and the possible effects of the power plant on the tribes' religious practices. Development at Fourmile Hill does not prevent access to important religious and cultural sites within the Highlands.[15] (FEIS at 4–336.) It does not affect the local Indians' freedom of belief or prevent them from continuing traditional religious practices if they so choose. The agencies considered Indian religious values in their decision and the Forest Plan does not clearly require more.

14. Plaintiffs' allegations and briefs concentrate on the failure of the FEIS and ROD to "address" all the relevant standards in the two Forest Plans. (Pls.' Opp'n at 45–47.) However, plaintiffs seem to be basing this claim on 16 U.S.C. § 1604(i), which requires that actions be consistent with Forest Plans. *See Friends of Southeast's Future*, 153 F.3d at 1070. A violation of § 1604(i) is not a failure to discuss possible inconsistency, but the inconsistency itself. Plaintiffs' arguments about a failure to *discuss* consistency with certain standards are irrelevant; the relevant question is whether the Fourmile Hill project *is* consistent with the Modoc and Klamath Forest Plans.

15. After the amendment previously discussed, the Klamath Forest Plan Standard 24–25 is almost identical to Standard 2–5 of the Modoc Plan. All of the above arguments about the Modoc Plan apply with equal force to the Klamath Plan.

*VII. Indian Trust Obligations*

Plaintiffs assert a claim based on the federal defendants' violation of their fiduciary obligations to the Tribe. They argue that the claim arises out of the federal defendants' issuance of the leases, extension of the leases, and approval of the Fourmile Hill project. (Pls.' Mot. at 17–21; Pls.' Opp'n at 47–48.) The plaintiffs emphasize the spiritual importance of the Highlands and the Tribe's assertion of jurisdiction over the Highlands in its constitution. That the Tribe asserts jurisdiction over the Highlands is an internal tribal matter and does not turn the Highlands into tribal land. *See* Felix Cohen, *Handbook of Federal Indian Law* 143 (1942 ed.) (noting that Indian tribes can exercise jurisdiction over tribal property and any individual property of tribe members even off tribal land). That the land is spiritually important to the Tribe also does not change the federal government's ownership of the land. *See id.* at 289 (distinguishing between tribal land and federal public land).

■ Though the Highlands are not Tribal land, plaintiffs argue that the Tribe's constitution is akin to a treaty and creates fiduciary duties for the federal government in its management of the Highlands. (Pls.' Reply at 6.) The federal government does owe a high fiduciary duty to a tribe when its actions involve tribal property or treaty rights. *See, e.g., Pyramid Lake Paiute Tribe v. U.S. Dep't of the Navy,* 898 F.2d 1410, 1420 (9th Cir.1990) (holding the federal government has a fiduciary duty to preserve and protect the Pyramid Lake fishery which is located on the reservation). However, the Pit River Tribe's constitution is not similar to a treaty—a binding obligation entered into between two sovereigns. Its constitution is a document for the Tribe's internal governance, and approval by the Secretary of the Interior does not transform it into a treaty. Although there may be a general fiduciary duty of the federal government owed to Indians, "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indians." *Morongo Band of Mission Indians v. FAA,* 161 F.3d 569, 574 (9th Cir.1998).

■ The plaintiffs attempt to distinguish *Morongo Band* because that case dealt with general reservation land and not an area held sacred for centuries like the Highlands. (Pls.' Reply at 8.) Plaintiffs cite a host of federal statutes, regulations, and executive orders demonstrating the federal government's recognition of the importance of tribal religion and spirituality, such as AIRFA, the Religious Freedom Restoration Act, Executive Order 13007, and provisions of the BLM manual. However, the existence of these provisions does not distinguish this case from *Morongo Band.* If these statutes and executive directives impose specific duties on the federal government towards Indians, then the federal government must obey the statutes and directives. But plaintiffs do not argue that these statutes and directives were actually violated, only that they demonstrate the importance of tribal spirituality. Under *Morongo Band,* the government's recognition of the central place of tribal religion and spirituality does not create new trust obligations and duties.[16]

16. Plaintiffs also rely on the decision in *Northern Cheyenne Tribe v. Lujan,* 804 F.Supp. 1281 (D.Mont.1991). However, *Northern Cheyenne Tribe* involved coal leases on federal land near the tribe's reservation. *N. Cheyenne Tribe,* 804 F.Supp. at 1283. *Northern Cheyenne Tribe* is like the Ninth Circuit's decisions recognizing that the federal government owes the Paiute Tribe a fiduciary duty when making decisions about upstream water use in Nevada that affect the size of Pyramid Lake, a tribal lake. *See, e.g., Pyramid Lake*

Because this case does not involve tribal property, the federal agencies' duty to the Tribe is to follow all applicable statutes. As discussed earlier, the agencies did not violate any statutes during the approval process for Fourmile Hill; therefore, the federal government satisfied its fiduciary duty to the local tribes.[17]

## VIII. Failure to Timely Implement the Record of Decision

Plaintiffs assert that the federal defendants have violated the Administrative Procedure Act by failing to implement the Record of Decision in a timely fashion, namely by failing to develop a Historic Properties Management Program for the Highlands. (Compl.¶ 129.) The Forest Service and the BLM committed to develop a Historic Properties Management Program in a Memorandum of Agreement, which was incorporated into the ROD issued for the approval of the Fourmile Hill project. (AR 20006, 20051.) Plaintiffs allege that the agencies have failed "to initiate and diligently pursue development of" the required Historic Properties Management Program, which amounts to an abuse of its discretion under the APA. (Compl. ¶ 130.)

The federal defendants argue that the court lacks jurisdiction to hear this claim under the APA, because there has been no final agency action. (Fed. Defs.' Opp'n at 50.) They argue that jurisdiction is inappropriate under 5 U.S.C. § 706(1), which grants jurisdiction to "compel agency action unlawfully withheld or unreason-

ably delayed," because there is no "clear statutory duty" to act. *Mont. Wilderness Ass'n, Inc. v. U.S. Forest Serv.*, 314 F.3d 1146, 1150 (9th Cir.2003). Plaintiffs argue that the agencies created a duty to act by adopting certain conditions as part of the ROD. However, there is no authority holding that a condition in a ROD or similar document can create the agency's duty to act for purposes of APA review. In the absence of any such precedent, the court declines to expand APA review of agency inaction in this context.

Moreover, and alternatively, even if the ROD creates a duty enforceable under the APA, the record in this case does not reveal any unreasonable agency inaction. The agencies have produced evidence showing substantial progress toward completion of the Historic Properties Management Program. A planning team has been assembled, and a Team Leader has been hired. (Gowan Decl. ¶¶ 3–4.) Meetings have been held with the agencies and the Klamath and Pit River Tribes. (*Id.* ¶ 4.) The major part of a draft report has been completed, and a portion shared with the Tribes. (*Id.* ¶¶ 5–6.) According to the agencies' expert, the development of the Historic Properties Management Program is a complex task; it is therefore impossible to consider the progress to date an arbitrary and capricious failure to implement the terms of the ROD.

## IX. Conclusion

The federal agencies properly observed all of the procedural requirements during

*Paiute Tribe*, 898 F.2d at 1420. The key fact in these cases is that the impacts occur on the reservation, which the federal government has a special duty to protect. However, the Fourmile Hill project does not directly affect life on the Pit River reservation.

17. The plaintiffs argue that the failure to meet with the local tribes prior to the development stage violated the government's fiduciary obli-

gations. However, the earlier decisions only allowed casual use and light exploration, which the government could reasonably conclude would have no significant effect on the tribes. When the agencies considered development, an action that might have significant effects on the tribes, they engaged the local tribes in significant consultations. *See supra* section I.D.

the various stages of approving the Four-mile Hill development project, including preparation of an extensive Environmental Impact Statement. The court's role is to review compliance with these procedures, not to review the substance of the agencies' decision. Therefore, defendants' motion for summary judgment is GRANTED, and plaintiffs' motion is DENIED.

IT IS SO ORDERED.